# Wytheville

SAM J. GLOVIER, ET AL. V. MAGGIE DINGUS.

June 12, 1939.

Record No. 2051.

Present, All the Justices.

The opinion states the case.

*M. M. Long* and *W. W. Bird,* for the appellants.

*Fred B. Greear* and *I. A. Beauchamp,* for the appellee.

HOLT, J., delivered the opinion of the court.

This appeal is from a decree in a suit for the partition of land among the heirs-at-law—and purchasers from certain of them—of Griffith G. Glovier, deceased.

The decedent died intestate in October, 1933. He owned at the time of his death a farm of about 150 acres on Lick creek, north of St. Paul, in Lipps magisterial district of Wise county. He bought it in 1903, built a house on it and lived there the remainder of his life. He was survived by his widow, Sally Glovier, and by ten children, namely, William S. Glovier, Thomas M. Glovier, George G. Glovier, Henry D. Glovier, John W. Glovier, Lloyd N. Glovier, Samuel J. Glovier, Margaret Glovier Blevins, Cornelia Glovier Williams and Ida Glovier Williams. Without assignment of dower, but with the consent of the heirs, the widow continued until her death, July 7, 1937, to live in the mansion house on the farm.

Prior to the death of the widow, J. W. Bandy bought the undivided one-tenth interest of Lloyd N. Glovier, and a deed was made to him by the widow and all the heirs. There is no copy of the deed in the record, but it is referred to in the evidence as having conveyed a certain definite part of the farm, and that the part was described "by courses and distances, or by metes and bounds." However, there is further evidence tending to show that Bandy was to receive what was necessary to vest him with a child's share, and that in the voluntary partition hereinafter mentioned some four or five acres were added to the tract theretofore conveyed him.

In July, 1937, shortly after the death of the widow, four men of the vicinity were chosen by the parties in interest

to partition the farm. The commissioners, so selected, went upon the land and after two days of work completed a partition of the 150 acres among the several owners and furnished each of them with a description by metes and bounds of his or her allotment.

Samuel J. Glovier bought the shares of his two brothers, Thomas M. and George G. Glovier, which purchase made his total holdings three-tenths. The plaintiff-appellee, Maggie Dingus, who is a daughter of William S. Glovier, bought the shares of two of her aunts, Cornelia Glovier Williams and Margaret Glovier Blevins, thereby becoming the owner of two-tenths. The remaining four-tenths are, or were when this suit was begun, owned respectively by William S., Henry D. and John W. Glovier and Ida Glovier Williams.

Following the voluntary partition, deeds were executed° by all the heirs to each allottee—except Maggie Dingus and her father, William S. Glovier—conveying to each the part of the 150-acre tract assigned him or her. William S. Glovier, while not having accepted a deed for his own share, united in the execution of each of the other deeds.

Maggie Dingus, being dissatisfied with the partition as made by the commissioners, institued this suit on December 19, 1937, for a judicial partition. In her bill she made no mention of the partition above stated but proceeded as though there had been none. The ten heirs-at-law and J. W. Bandy were made parties defendant, and in due course Samuel J., Thomas M., George G., Lloyd N., Henry D. and John W. Glovier, and Cornelia Glovier Williams, Ida Glovier Williams and Margaret Glovier Blevins filed their joint answer. After admitting the averments of ownership as set forth in the bill, the defendants alleged the previous voluntary selection of the four commissioners; that the latter had duly performed their duties; that the partition made by them was fair and just and as near equal in value as could be made; that following the partition Maggie Dingus took charge of the part allotted her and that she has been using it as her own ever since; that likewise the other parties have taken charge of and have been using the por-

tions assigned to them; that after the partition Maggie Dingus and John W. Glovier entered into a written agreement to exchange certain parts of the tracts laid off to them, and that the agreement was written and signed by her; and that she, "by reason of her acts and conduct in connection with said partition, has ratified and approved the same and is now estopped to institute and prosecute this suit, seeking another partition of said real estate."

The plaintiff filed a demurrer to the answer and also moved to strike that pleading from the record. Both the demurrer and the motion were overruled by the Circuit Court. After more than 200 pages of printed proof had been adduced by the respective sides the cause was orally argued by counsel and submitted.

On July 5, 1938, the Circuit Court made and entered a decree adjudging the ownership of the farm to be as alleged in the bill; "that there has been no mutual agreement for a partition of the tract of land between the owners thereof and that there has been no act or acts of ratification of any alleged partition sufficient to create an estoppel; that no definite lines were established by said alleged partition; and no survey made." The decree then dismisses the answer filed by the defendants, and grants the prayer of the plaintiff's bill.

Four of the defendants, Samuel J., John W. and Henry D. Glovier and Ida Glovier Williams, prosecute this appeal.

The contentions of counsel for neither side are indicated with the clear-cut definiteness that is desirable, yet from the record and the briefs we gather that they are substantially as follows:

In behalf of Maggie Dingus it is contended that the voluntary partition was and is without legal validity, first, because, as claimed, she took no part in the selection of the four commissioners; second, because, as claimed, she was not personally present when the commissioners performed their work or when they made their awards; third, because, as claimed, her interests were not represented on any of those occasions; fourth, because, as claimed, she did not re-

ceive a just and fair allotment; and fifth, because, as claimed, a parol partition is ineffectual by reason of the statute of frauds.

In behalf of the appellants it is contended, first, that Maggie Dingus herself participated to a certain extent in the arrangements for the partition and was from the outset represented by her father, William S. Glovier, and her husband, Rufus Dingus, and through them had full information at the time as to every step taken in the matter; second, that her attitude and her positive acts subsequent to the partition, as also the acts of the other parties in interest, constituted a ratification and a part performance such as render the partition legally valid and binding although in parol, and also that they work an estoppel; and, third, that the allotment made her by the commissioners was and is a fair and just one.

■■ Apparently, counsel for Maggie Dingus failed to appreciate the legal significance of the voluntary partition and the legal situation created by that partition and by the subsequent acts of executing and recording deeds, etc., else those facts would not have been disregarded in the drafting of the bill, as was done. Facts can not be obliterated, nor can their legal effect be annulled by any expedient so simple as that of ignoring them. Whatever of informality, or even of legal infirmity, may have characterized the previous partition, it was a fundamental misconception of the law of the matter to treat all those acts as though they had never been performed and as though no change in the legal status had resulted from them. On the contrary, a presumption existed that the voluntary partition was valid, and it was therefore necessary for the plaintiff, by allegation and proof, to overcome that presumption and to establish the invalidity of the existing partition before a situation would be created which would warrant the plaintiff in asking, or the trial court in decreeing, a second and judicial partition. Moreover, the decree as drawn and entered should have in express terms set aside and held for naught the former partition, if the

court found from the evidence that in law it was wholly ineffectual.

In *Pollock's Adm'r* v. *Sutherlin,* 25 Gratt. (66 Va.) 78, the syllabus of an elaborate and learned opinion of the court by Judge Moncure is in these words:

"All fair presumptions shall be made in favor of an award; and if, on any fair presumption, the award may be brought within the submission, it shall be sustained."

In *City of Portsmouth* v. *Norfolk County,* 31 Gratt. (72 Va.), 727, 734, this court quoted with approval the following from Chancellor Kent:

"The decision by arbitration is the decision of a tribunal of the parties' own choice and election. It is a popular, cheap, convenient domestic mode of trial, which the courts have always regarded with indulgence."

In *Corbin* v. *Adams,* 76 Va. 58, 61, Judge Staples delivering the opinion, this court said:

"After the arbitrators have acted and rendered an award the case is very different. Their decision is binding upon the parties, and can be successfully impeached only upon grounds which would invalidate any other judgment. This distinction between a mere agreement to submit and a submission consummated by an award is universally recognized by the authorities."

In *Coons* v. *Coons,* 95 Va. 434, 438, 28 S. E. 885, 886, 64 Am. St. Rep. 804, the court, by Keith, P., expressed this view:

"Boards of arbitration, which are courts of the parties' own selection, are favored by the law, and every fair presumption is made in order to sustain their award. This, we believe, is the universal rule applied to the interpretation of the agreement to submit, and to all the proceedings which lead up to, and result in, the award."

In *Equitable Fire & Marine Ins. Co.* v. *Stieffens,* 154 Va. 281, 290, 153 S. E. 731, 733, this court, in an opinion by Mr. Justice Gregory, observed:

"The burden of proof in a suit of this nature is upon the complainant. It is his duty to prove clearly and unequiv-

ocally the misconduct of the arbitrators or that they refused to consider material evidence, or that one of the parties was guilty of fraud."

And in *Edge Hill Stock Farm* v. *Morris, Gray & Hunter,* 155 Va. 103, 106, 154 S. E. 473, we dealt with the general subject of arbitration at greater length. Speaking by Chief Justice Campbell, we said:

"As we view the respective contentions of the parties, the fundamental question to be decided, so far as the present writ of error is involved, is: Can an award upon a submission *in pais, prima facie* valid upon its face, be assailed in an action at law, or must the complainant resort to a court of equity for relief? * * *

"At common law two kinds of submission and award were known. The first was upon a submission *in pais,* or in the country, and was where, in the absence of any pending suit, parties agreed to submit their then existing controversies to arbitration. The second was a submission made in a pending suit, in which case the award was returnable to the court, and was enforced by a rule after notice to show cause against it. There is in Virginia, by virtue of the statute, sections 6159 and following of the Code, 1919, an additional or statutory submission or award, and which arises when parties to an actual controversy then existing agree to submit their differences to arbitration, with the provision that the award so made may be returned to and entered as a judgment of the court."

It is clear, therefore, from the foregoing that, so far from its being permissible to disregard and to treat as a nullity an arbitration which, as here, has been at least in substantial measure consummated, such an arbitration is *prima facie* valid and gives rise to a legal status which must be reckoned with in quite a serious way.

The partition in the case at bar belongs to the first of the kinds of arbitration enunciated in the opinion last quoted from; that is, it was a submission *in pais.*

Coming now to the contentions of the respective sides, Maggie Dingus charges that the partition was invalid, first,

because she took no part in the selection of the four commissioners. The evidence tends to support that claim, but only in a literal sense. The proof shows clearly that, while she probably took no direct and personal part in the choosing of the commissioners, she was nevertheless quite aware of and consenting to what was done by her father and the others in that regard. She admits that she "had heard them talking that they were going to have it divided." Furthermore, her uncle, George Glovier, who was unmarried and living in the old home—where the Dinguses also had come to live after the intestate's death—testified: "I went back,—she was fixing to get dinner, and I went back and told her about it, and she said that would be all right, that Rufus wanted the land divided." We think, therefore, that there is no substantial merit in this contention.

Her second claim is that she was not personally present when the commissioners performed their work. The evidence shows such to have been the fact, but it also shows that the same was true with respect to most, if not indeed as to all, of the others also. Her absence would seem sufficiently explained by the intimations that she was in an advanced stage of pregnancy at the time.

Her third claim, that her interests were not represented or looked after by anyone, is definitely negatived by the evidence. The latter leaves no room for doubt that her father, William S. Glovier, and also her husband, Rufus Dingus, particularly the former, were active in representing her interests throughout. As a matter of fact, William S. Glovier seems to have been looked to by his brothers and sisters as well as by his daughter to have general charge of the business of bringing about the partition, although it appears that Henry D. Glovier also rendered considerable service in making the arrangements.

Asked on cross-examination why he objected to a second partition of the land, Henry D. Glovier answered:

"For the simple reason and because we agreed on having this done civilly, represented by Bro. Will Glovier and the rest of them. Bro. Will Glovier represented to me that it

was legal, and other citizens that it was legal, for us to go ahead and divide this land without a court order and that it is the thing we should do, to divide it ourselves, and I suggested to my Bro. Will to select him and two of the other brothers to divide, and he said that wouldn't be law, that we would have to select some one that was no kin to us. * * * We went ahead and had our verbal and civil agreement put in action and did divide our property, or had it divided, and went to the cost of having deeds made, and I wouldn't think it would be proper and right myself to impose any further trouble or expense on us. I don't think it is honest. Don't think it is right."

A simple, earnest statement like that, although by one making no pretension to any knowledge of the law, has, we think, much of legal as well as ethical force in it.

 Maggie Dingus' next claim, that her allotment was not a fair and just one, is scarcely sustained by the proof. It is evident, however, that her dissatisfaction with the award, rather than any legal invalidity of the procedure by which it was made, accounts in the main for the bringing of this suit. That she was disappointed in not having her grandfather's house included in the part assigned her is evident, and also not unnatural, but that that fact, or any other present in the case, renders the assignment to her an unjust or unfair one, we are unable to find. The house was built of materials for the most part obtained on the farm; and the labor of preparing the lumber, etc., and of constructing the house was performed by the father, Griffith G. Glovier, and his seven sons, except that a colored carpenter was paid a total of $50 for assisting. Four of the sons also had houses on the farm, each of them built with the co-operative help of the other brothers. In fact, each member of the family except George and Samuel had a house. The father's house was, and for years had been, the home also of the unmarried son, George; and in assigning the part including the mansion house to Samuel J. Glovier, who had bought the interests of his brothers, George and Thomas, it was expressly stipulated in the deed to Samuel

that George should have a home in the house so long as he lives, and the right to raise crops on one-third of the tract. From the description of it in the record, the house has never been completely finished and is not one of especial value.

Moreover, apparently as an evidence of his desire that his niece, Maggie Dingus, should be satisfied and content, Samuel J. Glovier made of record an offer to exchange the three tracts allotted him by the commissioners for the two tracts allotted Maggie and the one tract allotted her father, William S. Glovier. In the light of all which we find and conclude that this claim likewise is lacking in substantial merit.

The fifth, and last, contention on behalf of Maggie Dingus is that the partition is invalid because it was by parol and not in writing under seal. The defendants, on the other hand, contend that it nevertheless was and is valid in equity because of certain acts of ratification, concurrence and ownership performed by her since the partition, and because by her course generally she is estopped to challenge its validity.

Code, section 5561—the statute of frauds—provides, in part, that no action shall be brought "upon any contract for the sale of real estate, or for the lease thereof for more than a year," unless the contract, or some memorandum or note of it, be in writing and signed by the party to be charged thereby, or his agent.

Section 5141 provides that "No estate of inheritance or freehold, or for a term of more than five years, in lands, shall be conveyed unless by deed or will, nor shall any voluntary partition of lands by coparceners, having such an estate therein, be made except by deed; * * * ."

Due to the fact that certain undivided interests of the first takers, after the death of Griffith G. Glovier intestate, were transferred, the partition in the case at bar was one among tenants in common and not among coparceners. But whether the former came within the purview of the statute

need not be considered here, for reasons which will appear further on in this opinion.

In Minor on Real Property, section 901, it is said:

"An agreement to make partition may be enforced in equity, although not under seal, whenever a similar agreement to convey would be enforceable."

The principle was expressly approved by this court in *Martin* v. *Martin*, 112 Va. 731, 72 S. E. 680, in an opinion by Keith, P.

In *Wright* v. *Puckett*, 22 Gratt. (63 Va.), 370, 374, which was a suit for the sale of real property, the court, by Judge Christian, said:

"But the principles upon which courts of equity have avoided the statute of frauds, upon the ground of part performance of a parol agreement, are now as well settled as any of the acknowledged doctrines of equity jurisprudence. From the numerous decisions on the subject the following principles may be extracted and briefly stated as follows: 1st. The parol agreement relied on must be certain and definite in its terms. 2nd. The acts proved in part performance must refer to, result from, or be made in pursuance of the agreement proved. 3rd. The agreement must have been so far executed that a refusal of full execution would operate a fraud upon the party, and place him in a situation which does not lie in compensation. Where these three things concur, a court of equity will decree specific execution."

We think that the case at bar meets, and meets amply, the test of the three-fold rule above stated.

*First.* The evidence establishes beyond dispute that there was an agreement among all the parties in interest, including Maggie Dingus, that the land should be divided by the four men chosen, and that the agreement was as certain and definite in its terms as such an agreement could well be.

*Second.* The partition was made in July, 1937. Two months later Maggie Dingus agreed with John W. Glovier upon a change in a part of the boundary line between their respective allotments as fixed by the commissioners. The

agreement was written by Maggie at her father's dictation, was signed by her, and recites that the "object of this swap is to make a better fencing arrangement for both parties and also shape of both parties' land." Regarding the matter, John Glovier testified, in part, as follows:

"Q. Now, after this division was made, and the commissioners had gone, state whether or not you made exchange of lands with Maggie Dingus, * * * ?

"A. Yes, sir, I swapped a piece of my land with her that was above the road, running from a poplar to a locust crossing the road, I swapped a piece of land above the road for a piece of land below the road.

"Q. Was Maggie Dingus present when that exchange was made on the ground * * * ?

"A. No, sir, I was with Bro. Will and mentioned the land to him and he said he would go to the house to Maggie Dingus with me and that he would tell her how to write up the swap, and she agreed for him to be the one to come back and set the stakes and help to look or lay off the lines in her place, that she wasn't able to come up there and whatever he done was perfectly all right with her, him and Rufus.

\* \* \* \* \* \* \*

"Q. Who wrote the agreement for the exchange?

"A. Maggie Dingus wrote the agreement.

"Q. Who was present when this agreement was written?

"A. Me and Bro. Will was there present, Rufus Dingus was present, Bro. George was present on the porch * * * ."

On cross-examination he was asked and answered:

"Q. When you and Bill met in regard to this swap, did you decide on the corners and on the swap before you went to the house to see Maggie Dingus?

"A. Yes, sir. We didn't thoroughly decide on the corners. We went down and explained to her and she said that she didn't know anything about swapping land or trading, that she would leave that to her father and Rufus Dingus, and that whatever we done was perfectly all right with her."

Maggie Dingus does not deny writing and signing the line agreement between her and John, but claims it was under-

stood that it would not be binding unless the other owners consented to give her more land than she had been allotted. Her father, however, fails in any unequivocal and convincing way to corroborate her in that claim, and he played the chief part in the transaction; John denies that he heard anything of that kind said or that there was any such understanding; George, who was present, testifies that he heard no such claim until after the present suit was begun; and the writing itself contains no such qualification.

Plainly this line or exchange agreement referred to and resulted from the original agreement respecting the voluntary partition, and it seems to us to measure up to the requirements of the second item of the rule enunciated in *Wright* v. *Puckett, supra.* Furthermore, on cross-examination, John Glovier testified that since the partition and the line agreement between him and Maggie Dingus he has taken down some rail fences on his part and repaired other fences with them; that he has strung wire on posts that were already set; that he has cleaned off a part of the land; that he has repaired some roads on a part in order "to keep gullies from washing deeper in it;" and in response to the question, "You haven't done any fencing around the part allotted to you, have you?" he answered explaining in detail the arrangements regarding line fences and the temporary waiver of them agreed upon between himself and his sister, Ida Williams, and his brothers, Samuel and Henry, whose allotments adjoin his.

*Third.* Very considerable effort was expended, and trouble gone to, in securing the services of the four commissioners; the work of partitioning, staking off, etc., consumed two days; descriptions of each allotment were written and furnished the respective allottees by the commissioner who served as clerk; deeds have been drawn, executed and put to record covering all assignments except those to Maggie Dingus and her father; crops have been grown on the respective parcels; and a certain amount of fencing other than that already mentioned has been done, or at least posts for fencing set in place. All of this, while time consuming

and involving no small amount of labor, expense and bother, is yet, as to much of it, not readily, or perhaps at all, susceptible of measurement in money damages. And to require a repetition of all the steps involved in the partition would, we consider, be unreasonable and in violation of the just rights of the defendants. Besides, the partition made by the commissioners, voluntarily selected, has every appearance of fairness and the utmost good faith, nor is there anything whatever in the record to indicate that a second effort at division would achieve better results.

Without extending this opinion with a review of them, we think the conclusions we have reached in the instant case are in accord with, and are required by, the following authorities in addition to those hereinbefore cited: *Miller* v. *Miller*, 99 Va. 125, 37 S. E. 792; *Reed* v. *Reed*, 108 Va. 790, 62 S. E. 792; *Campbell* v. *Dotson*, 112 Va. 685, 72 S. E. 688.

The decree appealed from will be reversed, with costs to the appellants; and the cause will be remanded to the Circuit Court, with directions to set it aside and to enter in its stead a decree approving and confirming the voluntary partition made in July, 1937, including also the line or exchange agreement of September, 1937, between the plaintiff, Maggie Dingus, and the defendant, John W. Glovier; and for all such other and further proceedings, if any, in the matter of the execution of deeds and other steps, as may be necessary or appropriate in order to complete and to render in all particulars legally effectual the voluntary partition; and, if need be, to appoint a commissioner to execute on behalf of the parties such deeds or other instruments as may be necessary to that end.

*Reversed and remanded.*